1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10
11
12
13

IN RE MAXWELL
TECHNOLOGIES, INC.,
SECURITIES LITIGATION.

CASE NO. 13-CV-00580-BEN (RBB)

**ORDER GRANTING MOTION TO DISMISS**

[Docket No. 50]

14
15
16

Before this Court is a Motion to Dismiss filed by Defendants Maxwell Technologies, Inc. (Maxwell), David J. Schramm, and Kevin S. Royal. (Docket No. 50). For the reasons stated below, the Motion is **GRANTED**.

17

## BACKGROUND

18
19
20
21
22
23

Maxwell Technologies is a Delaware corporation based in San Diego, CA. Maxwell develops, manufactures, and markets energy storage and power delivery products, with a primary focus on ultracapacitors. Schramm served as CEO and President of Maxwell from July 2007 to December 31, 2013, and reached an agreement to serve as an advisor for two additional years. Royal has been the Senior Vice President, CFO, Treasurer, and Secretary of Maxwell since April 2001.

24
25
26
27
28

On March 7, 2013, Maxwell announced that it was restating its financial statements for 2011 and the first three quarters of 2012. Maxwell's sales organization made secret arrangements with certain distributors for special payment terms. The distributors would not have to pay Maxwell until the distributor was paid by the customers. Under Maxwell's revenue recognition policy, revenue is only to be

recognized where certain conditions are met, including that the collectability of the revenue is "reasonably assured."  (Compl. ¶¶ 29, 134-35).   However, Maxwell recognized the revenue from these sales too early, causing the financial statements to overstate revenue.  The inaccurate revenue numbers had been included in a number of SEC filings signed by Schramm and Royal.  These filings assert that GAAP principles are used and that the financial statements "present fairly the financial position, results of operations, and cash flows" of Maxwell.  (*Id.* ¶ 118).  Schramm and Royal also spoke on a number of conference calls about Maxwell and its financial performance.

On April 26, 2012, Maxwell announced disappointing financial results for the first quarter of 2012.  (*Id.* ¶¶ 10, 85).  A one-day drop of $6.20 per share, from $15.80 per share to $9.60 per share, followed. (¶¶ 10, 86, 162).  On March 7, 2013, Maxwell announced that there had been errors in past restatements, that it was required to restate results for 2011 and the first three quarters of 2012.  (*Id.* ¶ 11).  It also stated that it had to delay its annual report, that there were problems with internal controls and its credit agreement, and announced terminations and resignations of some Maxwell executives. (*Id.*)  The next day, shares fell $1.01. (*Id.*)  On March 19, 2013, Maxwell announced that McGladrey LLP had resigned as the independent accounting firm because it could not rely on management's representations and continuing internal control deficiencies. (*Id.* ¶¶ 4, 13, 90).  The stock price fell the next day.  (*Id.* ¶ 91[1]).  Plaintiff contends that, overall, the stock price dropped more than 70% from the class period high of $21.20 per share.  (*Id.*)  On April 30, 2013, Maxwell disclosed that the DOJ and SEC had begun investigations.

Maxwell published the restated financial statements on August 1, 2013.  In total, Maxwell states that $10.1 million in revenue had been recognized prematurely in 2011, and $9.2 million had been recognized prematurely in 2012.  (*Id.* ¶ 154).  Maxwell asserts that there were no phony transactions and that, with insignificant exceptions,

---

[1]The Court notes that the Complaint is inconsistent with respect to the exact size of the drop in the stock price on March 20, 2013.  (Compl. ¶¶ 13, 91).

Maxwell has been paid for all of the problematic sales transactions subject to the restatement. (Mot. at 5; Def. Ex. A at 11[2]).

Maxwell's audit committee conducted an investigation using outside counsel and forensic accountants. Certain Maxwell employees were terminated, and Senior Vice-President of Sales and Marketing Van Andrews resigned. While the investigation was ongoing, Maxwell's accountants, McGladrey LLP, resigned. McGladrey stated that they had decided not to accept representations from the current management and that Maxwell lacked sufficient internal controls over revenue recognition. Maxwell hired new accountants, who accepted representations from current management, including both individual defendants. Investigations have been commenced by the Securities and Exchange Commission (SEC) and the Department of Justice (DOJ).

In the wake of the restatements, several lawsuits were filed against Maxwell and the individual defendants on behalf of persons or entities that purchased Maxwell stock. On October 24, 2013, this Court consolidated four actions, and appointed The Employees' Pension Plan of the City of Clearwater as Lead Plaintiff ("Plaintiff"). (Docket No. 44). Plaintiff filed a Consolidated Complaint (Compl.) on January 17, 2014. (Docket No. 49). The Complaint, filed on behalf of persons or entities who purchased Maxwell stock between April 29, 2011 and March 19, 2013 (the "Class Period"), asserts two causes of action: (1) violation of Section 10(b) of the Securities and Exchange Act of 1934 (Exchange Act), and (2) violation of Section 20(a) of the Exchange Act. Plaintiff claims that Defendants made false statements about Maxwell's financial condition and internal controls, and that Schramm and Royal knew of or participated in the secret side arrangements with distributors.

---

[2]Defendants ask this Court to take judicial notice of documents referenced in the complaint and filed with the United States Securities and Exchange Commission. (Docket No. 50-2). Plaintiff did not state any objection to this Court taking judicial notice of these documents. Documents incorporated by reference in the Complaint and whose authenticity no party questions, are properly considered in a Rule 12(b)(6) motion. *E.g.*, *DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212, 1218 (S.D. Cal. 2001) (taking judicial notice of SEC filings referred to in the complaint). Accordingly the Request for Judicial Notice is **GRANTED**.

13cv580

On February 20, 2014, Defendants filed a Motion to Dismiss the Complaint on the grounds that Plaintiff failed to sufficiently allege scienter and that loss causation fails as to the April 26, 2012 announcement.  (Docket No. 50).

**LEGAL STANDARDS**

Section 10(b) of the Exchange Act makes it unlawful to:

> use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Pursuant to that section, the SEC promulgated Rule 10b-5, which makes it unlawful, in relevant part, to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstance under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).  Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), states that a person who:

> directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such a controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Section 20(a) claims may be dismissed summarily if the plaintiff fails to adequately plead a primary violation of section 10(b).  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (citations omitted).

To state a securities fraud claim, a plaintiff must plead (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase and sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Mattrix Init. Inc. v. Siracusano*, 131 S.Ct. 1309, 1317 (2011); *Reese v. Malone*, No. 12-35260, 2014 WL 555911, at *5 (9th Cir. Feb. 13, 2014) (citations omitted).  Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst*

1   *v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).

2       In ruling on a motion to dismiss in a securities fraud class action, the court

3   assumes all factual allegations to be true.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

4   551 U.S. 308, 322 (2007).  A court considers the complaint in its entirety, as well as

5   other sources courts ordinary examine when ruling on Rule 12(b)(6) motions to

6   dismiss, such as documents incorporated into the complaint by reference and matters

7   of which a court may take judicial notice.  *Id.*

8       At the pleading stage, a complaint stating claims under section 10(b) and Rule

9   10b-5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure

10  9(b) and the Private Securities Litigation Reform Act of 1995 (PSLRA).  Rule 9(b)

11  requires a party to "state with particularity" the circumstances constituting fraud or

12  mistake, but allows conditions of a person's mind to be alleged generally.  However,

13  the PSLRA applies special requirements to private actions for securities fraud.  Where

14  a plaintiff may only recover money damages on proof that a defendant acted with a

15  particular state of mind, the complaint must, as to each alleged act or omission, "state

16  with particularity facts giving rise to a strong inference that the defendant acted with

17  the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).

18      The Ninth Circuit has held that in a securities fraud action, plaintiffs must show

19  that defendants engaged in "knowing" or "intentional conduct."  *South Ferry LP, No.*

20  *2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008) (citing *In re Silicon Graphics, Inc.*

21  *Sec. Litig.*, 183 F.3d 970, 975 (9th Cir. 1999)).  Reckless conduct can meet the standard

22  to the extent it "reflects some degree of intentional or conscious misconduct," or what

23  has been termed "deliberate recklessness."  *Id.* (citing *Silicon Graphics*, 183 F.3d at

24  977).   In pleading deliberate recklessness, the plaintiff must plead a "highly

25  unreasonable omission, involving not merely simple, or even inexcusable negligence,

26  but an extreme departure from the standards of ordinary care, and which presents a

27  danger of misleading buyers or sellers that is either known to the defendant or is so

28  obvious that the actor must have been aware of it."  *Zucco*, 552 F.3d at 991 (quoting

*Silicon Graphics*, 183 F.3d at 976).  Facts showing "mere recklessness," or motive and opportunity to commit fraud, provide some reasonable inference of intent, but are not independently sufficient.  *Reese v. Malone*, 2014 WL 555911, at \*7 (citing *Silicon Graphics*, 183 F.3d at 974).

The strong inference is required to be "cogent and compelling, thus strong in light of other explanations." *Tellabs*, 551 U.S. at 324.  The inquiry is "inherently comparative" and requires that a court consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. *Id.*  Although the inference that a defendant acted with scienter need not be irrefutable or the "most plausible" of competing inferences, it must be more that merely "reasonable" or "permissible." *Id.*  A complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*  The relevant inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323 (emphasis in original).  In reviewing the sufficiency of scienter allegations after *Tellabs*, the Ninth Circuit has conducted a dual inquiry in which it first determines if any allegation, standing alone is sufficient to create a strong inference of scienter. *Zucco*, 552 F.3d at 992.  If not, it examines the complaint holistically to determine if the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness. *Id.*

## DISCUSSION

Defendants argue that Plaintiff has failed to sufficiently allege scienter.  They argue that the Complaint does not allege facts giving rise to the "strong inference" that Schramm or Royal were involved in or knew of the secret side arrangements which caused the restatement. (Mot. at 2).

Plaintiff points to a number of different allegations which it contends are sufficient to raise a strong inference of scienter, when viewed holistically.  Plaintiff

points to the statements of five confidential witnesses included in the complaint. It also points to a variety of other facts, such as the "noisy" resignation of Maxwell's auditor, the individual defendants' performance-based compensation, government investigations, the individual defendant's role in the corporate structure, and alleged involvement in relevant transactions. Defendants dispute that such allegations give rise to a strong inference, and point to other facts which they contend undermine a strong inference of scienter.

This Court individually examined the various allegations raised to determine if they are sufficient to create a strong inference of scienter. As none are individually sufficient, the Court examined them holistically to determine if they create a strong inference of scienter when viewed in combination. As this Court determines that a strong inference of scienter is not created, it will not proceed to unnecessarily consider loss causation.

A.  Corporate Scienter

Plaintiff argues that corporate scienter is satisfied because defendants Schramm and Royal, as well as non-defendant Andrews, were senior-level executives responsible for Maxwell's core operations and acted with the requisite scienter. (Opp'n at 10). Plaintiff argues that Maxwell's corporate scienter is "beyond reasonable dispute" because it admitted that Andrews left the company "as a result" of the investigation into wrongdoing. (Opp'n at 4). Plaintiff contends that the scienter of Andrews, Schramm, and Royal can be imputed to Maxwell, and that Maxwell is liable for the securities fraud of its "controlling employees." (*Id.*)

Defendants do not appear to dispute that the scienter of named individual defendants Schramm or Royal can be imputed to Maxwell, but argues that non-defendant Andrews' scienter cannot be so imputed. Defendants argue that the effort to attribute the knowledge of an employee to the company is an attempt to use a "collective scienter" theory which is not the law in this Circuit. (Reply at 1). Defendants cite to *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 744-45 (9th

Cir. 2008), in which the Ninth Circuit noted a circuit split on the issue, and stated that its precedent did not foreclose the possibility that collective scienter might be appropriate in some circumstances.  However, the Ninth Circuit in *Glazer* required that a plaintiff who rested his claim on three statements in a legal document plead scienter as to the individuals who actually made the false statements in the merger agreement. *Id.* at 745.  The Ninth Circuit did not lay out a test for determining when individual scienter might not be required, but stated that it reached its conclusion based on the "nature and unique context of the alleged misstatements in this case." *Id.*

This Court has examined the arguments raised by Plaintiff, and has determined that Plaintiff has not demonstrated that collective scienter is applicable here.  As in *Glazer*, this Court looks at the nature and context of the misstatements.  Plaintiff's claims are based upon statements by the individual defendants and in official filings signed by the individual defendants.  It is thus necessary to require scienter as to the individuals who were responsible for the statements.  This is not a situation in which the fact that Andrews or another employee may have had the requisite knowledge indicated that the individual defendants who made or authorized statements knew they were false when they were made.  The fact that Andrews, a non-defendant, allegedly had knowledge of misconduct does not indicate that any statements were made with the necessary mental state.

The Court has examined the cases cited by Plaintiff.  Although the case law supports holding a corporation responsible for the actions of its executives, Plaintiff does not cite cases that support corporate scienter based only upon the scienter of a non-defendant who did not make or certify the statements at issue.  Thus, although this Court agrees with Plaintiff that corporate scienter is alleged if it is sufficiently alleged that Schramm or Royal had the necessary mental state, corporate scienter is not sufficiently alleged under these circumstances where one executive had the knowledge and other, perhaps-innocent executives made the statements.

///

B.  Plaintiff's Arguments for Individual Scienter

Plaintiff's briefing points to numerous allegations which it contends support a strong inference that Schramm and Royal had the necessary mental state.

i. Confidential Witnesses

The principal argument set forth by Plaintiff is that a strong inference of scienter arises from the statements made by five confidential witnesses who are described and quoted in the Complaint.  Plaintiff contends that these statements support the claim that Schramm and Royal engaged in, or knew about, the side deals and improperly realized revenue.  Defendants raise numerous challenges to the statements.

A complaint relying upon statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements.  *Zucco*, 552 F.3d at 995.  First, the confidential witnesses must be "described with sufficient particularity to establish their reliability and personal knowledge."  *Id.* (citing *In re Daou Systems, Inc.*, 411 F.3d 1006, 1015-16 (9th Cir. 2005)).  Second, the statements themselves must be "indicative of scienter."  *Id.* (citing *Daou*, 411 F.3d at 1022).

a.  Confidential Witness #1

Confidential Witness #1 (CW1) was Maxwell's Vice President of Business Development from January 2006 to March 2013.  (Compl. ¶ 52 n. 16).  CW1 initially reported to Schramm, and after 2010 reported to Andrews and Schramm.  (*Id.*)  CW1 was fired for purported involvement in the accounting scheme.  (*Id.*)  CW1 reports that "things definitely changed" after Andrews arrived and that she[3] was taken "out of the loop" on many of the issues in the restatement.  (*Id.* ¶ 52).

CW1 reports that she was involved in a shipment of product that was not going to be accepted by the end user.  (*Id.* ¶ 61).  She reports that Andrews directed her to speak with Alfatec, the company's German distributor, and have the shipment delivered to Alfatec.  (*Id.*)  CW1 stated that Alfatec knew Maxwell wanted Alfatec to take and

[3]This Court follows Plaintiff's convention of referring to all confidential witnesses with female pronouns to protect confidentiality.

store the product, but that Alfatec would not pay for the product at the time. (*Id.*) CW1 stated that this arrangement might not be a problem if it had been properly accounted for by Maxwell. (*Id.* ¶ 62). The Complaint says that CW1 reported questioning Andrews about changing the terms of the shipment, and Andrews told her that it was "OK'd by David," presumably referring to Schramm. (*Id.*) CW1 also states that Andrews was warned by Schramm that he would be fired and allowed to resign, but does not state how she knew Andrews was warned. (*Id.* ¶ 81).

Defendants raise a number of arguments regarding CW1. First, they point out that CW1 and CW4 are both former, disgruntled employees. Plaintiff argues that this goes to the witnesses credibility, and it is not appropriate for this Court to determine credibility issues at this stage. This Court agrees with Plaintiff. The Court will examine the witnesses for indicia of reliability and personal knowledge, but it will not ignore detailed and otherwise reliable allegations simply because the witness might have a motive to lie. *See In re Gilead Scis. Sec. Litig.*, No. C 03-4999, 2009 WL 3320492, at *2 (N.D. Cal. Oct. 13, 2009).

Second, Defendants argue that the confidential witnesses offer sweeping generalizations, not specific facts. Plaintiff's description of the confidential witness accounts raises serious problems. In reviewing the Complaint's characterization of their statements, it is often unclear what the witness actually said, what the Plaintiff has inferred, and what is commentary by the Plaintiff. To the extent that certain ideas were expressed by the witness, their basis is often unclear. In particular, this Court cannot determine from the Complaint whether *any* of the confidential witnesses had any reason to believe the individual defendants knew there were improprieties.

In the case of CW1, for instance, the Complaint reports that CW1 stated that the arrangements might not have been problematic if reported, then states that "However, the Individual Defendants made sure this was not the case in order to boost Maxwell's sales figures." (Compl. ¶ 62) The Complaint does not indicate whether CW1 said this or it is Plaintiff's commentary. If CW1 did say this, it does not explain the basis for the

statement.  For instance, the Complaint does not report any statements made by the individual defendants that suggest that they knew the sales were not properly reported to accounting, much less why they did so.  The Complaint also states that CW1 confirmed that the secret change was ordered by Andrews and Schramm, and the Opposition indicates that CW1 stated that Schramm ordered secret alteration of terms and Andrews carried them out.  (*Id.*; Opp'n at 16).  However, the Complaint does not indicate what, if anything, CW1 said to indicate that she concluded that Andrews or Schramm knew it was secret, on what basis she reached that conclusion, or whether either man actually ordered her to do it without telling anyone.  This Court therefore cannot tell whether this statement is CW1's characterization of events or merely Plaintiff's interpretation of the fact that CW1 was told to change the payment terms.  There is also no basis from which this Court could conclude that CW1 had personal knowledge of the fact that Andrews was warned in advance of the terminations.

It appears that CW1 was in a position to know about the existence of unreported side arrangements, and might have plausibly learned whether the individual defendants were aware of the sales arrangements and how they were reported to accounting.  However, in order for the statement of CW1 to support scienter, Plaintiff must give this Court a sufficiently clear indication of what CW1 actually said and the basis for that statement.  With respect to much of the description of CW1's statement, this Court cannot determine which allegations and comments were made by CW1.  To the extent it is clear Plaintiff is relating the statement of CW1, Plaintiff has frequently failed to establish reliability and personal knowledge.  Those statements for which reliability and personal knowledge have been established are not sufficiently indicative of scienter.  Although Plaintiff's characterization suggests that CW1 may possess evidence of scienter, Plaintiff has not communicated that evidence in a way that allows this Court to infer scienter.

///

///

### b. Confidential Witness #2

Confidential Witness #2 (CW2) was Maxwell's Sales Operations Manager from February 2008 to May 2011. (Compl. ¶ 53 n. 17). CW2 was responsible for sales reporting and client contracts, including the preparation of sales reports and attendance at weekly sales meetings. (*Id.*) These reports included information about outstanding sales, received orders, unfulfilled sales, and invoiced orders. (*Id.*) The Complaint alleges that CW2 characterized the environment at Maxwell as becoming more secretive and restrictive after Andrews arrived. (*Id.* ¶ 53). CW2 is reported as stating that she did not trust Andrews and that he was a typical sales person who "pushed to get stuff done" at the end of quarters. (*Id.*) CW2 stated that she was "not surprised" by the need for the restatement. (*Id.*) CW2 reports that Andrews excluded her from weekly sales meetings after he arrived, but that she still sent reports to Andrews. (*Id.* ¶ 63). CW2 is quoted as saying she was "sure at the time" that there were orders being reported as booked when that was not actually the case. (*Id.*) CW2 also stated that Andrews addressed issues or discrepancies with the terms of the transaction. (*Id.*)

The account of CW2 does not support a strong inference of scienter. There is no indication in the statement that Schramm or Royal were aware of the side deals, or the fact that the deals were not reported. Indeed, it is not clear that CW2 actually knew anything about the scheme while at Maxwell, much less who was involved. Defendants also correctly point out that CW2 was not working at Maxwell for much of the Class Period. These statements provide little support to infer scienter.

### c. Confidential Witness #3

Confidential Witness #3 (CW3) was Maxwell's Senior Sales Operations Administrator from September 2011 through June 2012. (Compl. ¶ 64 n. 19). CW3 was responsible for entering and processing orders, as well as for overseeing the implementation of a customer relationship system. (*Id.*) CW3 participated in weekly Accounts Receivable meetings. (*Id.*) CW3 reported to Andrews and Tara Whiteside, the Business Planning & Sales Operations Manager. (*Id.*) The Complaint reports that

CW3 talks about the fact that it was "always a scramble" to process Alfatec orders and put the products "on a boat" to count the orders during the reporting period. (*Id.* ¶ 64) The Complaint states that "CW 3 understood that this was being done so that these orders could be booked as revenue in the quarter about to end even though the Individual Defendants knew this wasn't the case . . ." (*Id.*) CW3 stated that Schramm, Royal, and Andrews received flash reports that set forth expected sales, which were "always inflated" because of the sales quota. (*Id.* ¶ 65). CW 3 is quoted as saying the "integrity of the orders came into question." (*Id.*)

The Complaint recounts CW3's description of events involving Maxwell distributor Pana-Pacific. (*Id.* ¶ 66). CW3 reported that she entered terms for the orders based on purchase orders and invoices, but that the terms were not the same as the terms Andrews verbally extended to Pana-Pacific. (*Id.*) CW3 stated that Pana-Pacific's accounts receivable became past-due and that she raised this issue in the Accounts Receivable meetings, which included Andrews and "on occasion Defendant Royal." (*Id.* ¶ 67). CW3 says that Whiteside told her that Andrews had a verbal agreement with Pana-Pacific to extend the payment terms. (*Id.*) CW3 stated that extending such terms required Royal's approval, and the Complaint states that "the CFO should have been involved." (*Id.*)

CW3 also discussed Maxwell's policy on credit holds. (*Id.* ¶ 68). She stated that additional orders could only be shipped if one of the individual defendants, usually Royal, released the hold. (*Id.*) The hold was released on Pana-Pacific despite unpaid receivables. (*Id.*) CW3 states that Whiteside told her that she should not try to collect from Pana-Pacific because Andrews was "handling it," and that she should not talk to Andrews about Pana-Pacific. (*Id.* ¶ 69). CW3 states she expressed concerns to Whiteside. (*Id.*) CW3 did state that she felt it was "very weird" to be directed to remain silent about the situation. (*Id.* ¶ 70).

CW3's account cannot support a strong inference of scienter. Although the Complaint's discussion of CW3 states that the individual defendants knew that revenue

was being improperly booked, it is unclear whether CW3 ever says this, or if CW3 has any basis to say this.  Although the Complaint indicates that CW3 was told to remain silent, this allegation is too ambiguous to help infer scienter.  This Court cannot tell if the Complaint was referencing Whiteside's instructions or one of the individual defendants told her not to talk about the side deals.  None of the allegations provide specific facts from which this Court could infer that the individual defendants knew that side deals were not being communicated to the accounting department. At most, it indicates that one or both individual defendants were aware of collection problems and authorized credit hold decisions that allowed additional products to be shipped and improperly booked.  It is not, however, clear from the Complaint that Maxwell policy was followed and that either individual defendant actually authorized special terms or lifting credit holds.  Plaintiff argues that CW3's testimony "fatally undermines any claim that Royal and Maxwell were unaware of Pana-Pacific's undisclosed extended payment terms." (Opp'n at 15).  The Court agrees that it is somewhat undermined. However, even if Schramm and Royal knew about the side deals, this does not indicate that they knew that revenue was improperly booked.  Plaintiff also points out that CW3's account of end-of-period activity was corroborated and that other CWs had suspicions about the revenue being booked.  (*Id.* at 16).  However, Plaintiff has not explained how an active sales department and the suspicions of third parties indicates that the individual defendants knew about the improper accounting.

d.  Confidential Witness #4

Confidential Witness #4 (CW4) was Maxwell's Senior Director of Global Sales and Marketing from August 2012 to March 2013.  (Compl. ¶ 71 n.20).  CW4 also worked at Maxwell from February 2008 to July 2010 as Director of Sales and Marketing for the Americas.  (*Id.*)  From 2012, CW4 was responsible for sales strategy and managing customer relationships, and reported to Schramm and Andrews.  (*Id.*) CW4 was fired for purportedly having a role in the events leading to the restatement. (*Id.*)  CW4 made statements pertaining to both Maxwell business practices, and

conversations overheard during carpool rides.

First, the Complaint alleges that CW4 states that the illicit business practices were used with clients worldwide. (*Id.* ¶ 71). CW4 provides details on the kinds of arrangements that were made. (*Id.* ¶ 72). CW4 stated that Royal approved extended payment terms, and that only Schramm and Royal could lift a credit hold. (*Id.*)

Although these statements allow an inference that the actions of one or both defendants was necessary to carry out the misconduct, it alone does not establish scienter on the part of Schramm or Royal. The fact that the individual defendants made or should have made decisions on payment terms or credit holds does not indicate that they knew that the effects of those decisions were not properly reported to accounting.

Second, CW4 makes claims based on the fact that she "often" joined Schramm and Andrews in their carpools. The Complaint states that she heard "off the record conversations" which Plaintiff alleges "included these problematic business practices." (*Id.* ¶ 82). The Complaint states that CW4 recalled Schramm telling Andrews to "take certain actions necessary to 'make the numbers,' and that Schramm boasted that he had 'a clean bill of health' regarding his participation in these practices." (*Id.*) CW4 states that she has a lot of information and can put "a nail in the coffin" of Schramm and Royal. (*Id.*) CW4 claimed that Schramm and Royal were "spearheading" the fraudulent transactions and were responsible for the matters that were restated. (*Id.* ¶ 83). She allegedly claims that they "knew everything" and were "guiding it." (*Id.*) She states that she was "told what to do" by the individual defendants and that the individual defendants knew what was going on. (*Id.*)

The Court has very carefully examined these allegations. These statements certainly indicate that CW4 may have heard or seen something from which this Court could infer scienter. However, as with the other confidential witnesses, it is not always clear what CW4 actually said. Additionally, this Court cannot actually determine what CW4 claims to have heard. Many of the statements about the role of Schramm and Royal are conclusory and without foundation. It is not clear from the pleadings, or

13cv580

from the briefing, whether the carpool conversations acknowledged that revenue was improperly recognized, or if the discussion of problematic business practices meant only that Schramm indicated knowledge of the special sales terms.  Although CW4 believes CW4 has damaging evidence, Plaintiff has not shared any specific facts from which this Court can conclude that CW4 possesses facts giving rise to scienter.

e.  Confidential Witness #5

Confidential Witness #5 (CW5) was Maxwell's Director of Sales and Marketing from June 2010 to October 2012.  (Compl. ¶ 73 n. 21).  She was responsible for sales to both customers and distributors.  (*Id.*)  In her final months, CW5 participated in weekly Days Sales Outstanding meetings with Royal and other executives where they discussed accounts receivables. (*Id.*) She reported to and interacted with Schramm and Royal.  (*Id.*)

According to the Complaint, CW5 discussed the Alfatec arrangements, including the fact that Alfatec was brought in to serve as a buffer and hold inventory.  (*Id.* ¶ 73). CW5 stated that although later deals and purchase orders usually matched the original contract, purchase orders for the transactions in the restatement would not have included the additional terms and concessions.  (*Id.* ¶ 74)  She stated that the need to restate revenue was "not a surprise" given the clients' failure to send payment.  (*Id.*) CW5 also reports that an analyst had asked Schramm why the accounts receivables had grown three-fold, but the sales only grew by a factor of 1.2.  (*Id.* ¶ 75).  The Complaint characterizes CW5's statement as saying that this analyst was not satisfied with Schramm's answer, that the "analyst published that Schramm's explanations did not make sense" and that the analyst made efforts to get to bottom of the issue.  (*Id.*)  CW5 states that the individual defendants began a weekly meeting in May 2012 regarding past-due accounts, which CW5 attributed to the analyst's inquiry.  (*Id.* ¶ 76).  Royal directed this meeting, which would discuss accounts where special payment terms had been extended.  (*Id.*)  From this, the Complaint concludes that the individual defendants "were pushing to present financial results that were in line with the

1  Company's representations to Wall Street." (*Id.*).

2      CW5 also states that while some people at the company blamed lower
3  executives, other people at Maxwell knew that this was not the case. (*Id.* ¶ 79). CW5
4  said the Defendants needed to produce numbers in order to appear to be a growth stock
5  company. (*Id.*). CW5 also stated that Andrews, Royal, and Schramm were close
6  friends and that Schramm and Andrews lived in the same community, went to the same
7  country club, and carpooled every day. (*Id.* ¶ 81).

8      It is unclear from Plaintiff's characterization of CW5's statement whether CW5
9  actually possesses any knowledge from which this Court could conclude there is a
10 strong inference of scienter. The Complaint does indicate that Royal would have been
11 aware of an issue with past-due accounts. However, none of the statements indicate
12 that CW5 heard either individual defendant say anything or knew that the individual
13 defendants heard something that indicates that they knew there was a revenue
14 recognition problem. It is entirely possible from the description that CW5 might have
15 such facts, but Plaintiff must present them clearly; this Court cannot speculate on what
16 CW5 might have meant. The Complaint also fails to indicate if CW5 actually knows
17 what, if anything, the analyst told Schramm. The Complaint's characterization of her
18 statement as saying the analyst "published" that Schramm's explanations did not make
19 sense suggests that CW5 was not present and is relying on hearsay from the unnamed
20 analyst. Although hearsay can be considered, it can indicate that a witnesses' report
21 is "not sufficiently reliable, plausible, or coherent to warrant further consideration
22 under *Daou*." *Zucco*, 552 F.3d at 997 n.4. Here, the fact that CW5 may not have been
23 present undermines this Court's ability to draw significance from her report that an
24 unnamed individual presented unknown facts to Schramm and got a response that did
25 not satisfy him or her. CW5's allegations that the individual defendants and Andrews
26 were friends and shared a social circle do not mean that the individual defendants knew
27 of wrongdoing. It is, however, consistent with the theory that Andrews was working
28 with Royal and Schramm on the scheme and that all three knew about the improperly

1  recognized revenue.

2  <u>f. Conclusion</u>

3    The confidential witness accounts do not indicate that the individual defendants

4  were aware of the recognition problem. The parties are not disputing whether there

5  were accounting improprieties, or the fact that side arrangements were extended. The

6  confidential witness testimony offered by Plaintiff supports an inference that the

7  individual defendants knew that there were some problems with collections, and were

8  aware of special payment terms and credit hold decisions. However, Plaintiff has not

9  indicated that there was anything inherently wrong with extending payment terms or

10  making a special sales arrangement. Such arrangements are a problem *when they are*

11  *not properly taken into account* at the accounting stage. The question is thus whether

12  Schramm and Royal knew that the special sales terms were not being properly taken

13  into account in the financial statements. If the confidential witnesses possess any

14  information on this subject, it was not laid out with sufficient clarity for this Court to

15  infer scienter.

16    To the extent Plaintiff is arguing that the level of the individual defendant's

17  involvement in payment terms and meetings indicates that they must have known there

18  was a problem with the revenue numbers, Plaintiff needs to explain why this is so. The

19  Court cannot speculate.

20    Review of Plaintiff's pleading and the characterizations of the CW statements

21  in Plaintiff's Opposition indicates that Plaintiff may be able to make a stronger case if

22  the Complaint is amended to more clearly and completely explain what the CWs know

23  and have said. To the extent the CWs actually heard or saw something that indicated

24  that the individual defendants knew the terms were secret or that sales were improperly

25  booked, Plaintiff should clearly lay these facts out. Plaintiff should avoid

26  characterizing the testimony in a manner that makes it difficult for this Court to

27  differentiate between witness statements and Plaintiff's own conclusions.

28  ///

### ii. Andrews

Plaintiff alleges that Andrews was the "third in command" who reported directly to Schramm and Royal. (Compl. ¶ 51). Plaintiff claims that the culture of Maxwell changed dramatically, "becoming more secretive and isolationist." (*Id.*) It also points to the fact that Maxwell's financial results increased nearly immediately after Andrews was hired. (*Id.* ¶ 54). The confidential witness accounts indicate that Andrews had strong personal relationships with the individual defendants, and was actively involved in extending special sales terms and handling past-due accounts. Such allegations may support claims of misconduct by Andrews, but they do not establish that Royal or Schramm were involved. The personal relationship between Andrews and the individual defendants is consistent with their cooperation in a revenue scheme, but the existence of a warm relationship does not indicate that Schramm and Royal knew what Andrews was doing or that they knew that special sales terms were not properly considered in Maxwell's accounting.

### iii. Auditor's Resignation

Plaintiff argues that the "noisy" resignation of Maxwell's auditor supports a strong inference of scienter. Plaintiff points to the fact that McGladrey LLP resigned in part because it could not rely on representations from current management and certain third parties. (Opp'n at 18). Plaintiff argues that this is consistent with allegations that Defendants colluded with third parties to improperly recognize revenue through undisclosed arrangements. (*Id.*) Plaintiff emphasizes that Maxwell disclosed the reasons for the resignation, even though such a disclosure is not generally required. Defendants dispute this. (Reply at 8 (citing 17 C.F.R. § 229.304(a)(1)(v))). Defendants also argue that if McGladrey LLP believed that the CEO and CFO had engaged in fraud, it would have been required to report this fact to the SEC. (*Id.* at 8-9). Defendants point out that a new auditor relied on management's representations. Plaintiff argues that this only points to an "economic opportunity" for the new auditor, and is not an implicit blessing of management's integrity. (Opp'n at 18).

Based on the information alleged, this Court cannot find that the resignation alone gives rise to a strong inference of scienter. One auditor was willing to trust the representations, and one was not. This Court has no information that allows it to draw stronger inferences from one more than the other. An independent auditor's resignation because it feels it cannot rely on management's representations may, under certain circumstances, support an inference that the company was misrepresenting or concealing its financial health. *In re Am. Apparel, Inc. Shareholder Litig.*, 855 F. Supp. 2d 1043, 1083 (C.D. Cal. 2012). However, such a recognition by itself does not demonstrate that management acted intentionally or recklessly, rather than acting incompetently, in ignorance, or based on a mistake. *See id.* at 1084. This Court does not know why McGladrey concluded that it could not rely on the statements of management. There is no indication that McGladrey believed either individual defendant was engaged in the misconduct, and no evidence was presented to suggest that McGladrey had any information about what Schramm or Royal knew about the misconduct. Without additional explanation about the reasons for resigning and the basis for their mistrust, the resignation alone does not indicate that the individual defendants had scienter. However, the fact that McGladrey felt it could not trust the representations of management does indicate that the auditors had doubts about the individual defendants' willingness to be truthful or forthcoming with respect to the misconduct. The Court considers the resignation in the holistic analysis.

iv. False Certifications, GAAP Violations, and the Need to Restate

Plaintiff points to the false SOX certifications and "numerous admitted GAAP violations" as contributing to a strong inference of scienter. (Opp'n at 19). It emphasizes the importance of the inflated earnings, and claims that if they actually had designed and evaluated internal controls over financial reporting as they stated in the certifications, the "substantially inflated financial results and GAAP violations could not have escaped notice." (*Id.* at 19-20).

Plaintiff also contends that the admissions made during the restatement provide

strong support for inferring scienter.  Plaintiff points to the fact that Maxwell restated nearly two years of financial results and admitted that there was deliberate accounting misconduct.  Plaintiff cites to *Backe v. Novatel Wireless, Inc.*, 607 F. Supp. 2d 1145, 1161-63 (S.D. Cal. 2009), *on reconsideration*, 642 F. Supp. 2d 1169, 1186 (S.D. Cal. 2009), in which a district court found scienter based in part upon early product shipment, GAAP violations, and the simplicity of the accounting principles involved.

Defendants contend that the circumstances of the restatement do not give rise to a strong inference of scienter.  (Mot. at 11).  They emphasize that merely restating financial statements or failing to follow GAAP is insufficient, without more, to establish scienter.  (*Id.* (citing *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002))).  Defendants argue that a financial restatement can suggest that internal controls were ineffective, but that this is not enough to demonstrate that a CEO or CFO acted with scienter.

The Court agrees with Defendants that these facts alone do not give rise to a strong inference of scienter.  GAAP violations and false certifications can take place where there is no scienter.  However, Plaintiff appears to argue in the briefing that, given the nature of the violation, Defendants could not have missed the violations if they evaluated the internal controls as they claimed.  Although the large amount at issue suggests Plaintiff's argument may be plausible, this Court does not have the information to evaluate this argument and conclude there is a strong inference of scienter.  Plaintiff has not presented the necessary information about accounting principles and internal controls to allow this Court to evaluate whether the individual defendants should have been or must have been aware of the violations.

### v. Core Operations

The Ninth Circuit has stated that as a general matter, corporate management's general awareness of the day-to-day workings of the business does not establish scienter, at least absent additional allegation of specific information conveyed to management and related to the fraud or other allegations supporting scienter. *S. Ferry*

*LP, No. 2*, 542 F.3d at 785 (citation omitted).   However, allegations regarding management's role in a corporate structure may be considered as part of the holistic analysis required in *Tellabs*, and such allegations can independent satisfy the PSLRA where they are "particular and suggest that defendants had actual access to the disputed information." *Id.* at 785-86.   Management's role and the importance of the corporate information may create a strong inference of scienter when made in conjunction with "detailed and specific allegations about management's exposure to factual information within the company." *Id.* at 785; *Zucco*, 552 F.3d at 1000.   In "rare circumstances," particularized allegations are not needed where the nature of the relevant fact is of such prominence that it would be "absurd" to suggest that management did not have knowledge of it. *S. Ferry LP, No. 2*, 542 F.3d at 786.

Plaintiff asserts that the inference of scienter is strengthened because the revenue recognition scheme involved Maxwell's "core business." (Opp'n at 20).   Plaintiffs also allege that Maxwell operated under an "executive-centric, top-down organizational structure" in which major changes to contract and payment arrangements had to be approved by senior executives, and material changes to payment terms for sales had to be approved by Royal and/or Schramm. (Compl. ¶ 31).

Defendants reject the suggestion that scienter is supported by the individual defendant's high-level positions and "top-down" corporate structure, and cite to cases in which high rank is insufficient to infer scienter.   The Court agrees that rank alone does not suffice to infer scienter.   There is also insufficient information before this Court for the Court to conclude that it is "absurd" to suggest that the individual defendants did not have knowledge of the improper accounting.   The inflation of revenue arose out of a combination of side deals, many of which were allegedly carried out by Andrews, and the failure to communicate those deals to the people who should have adjusted the revenue reported.   Plaintiff has not demonstrated to this Court that lack of awareness of this fact rises to the level of absurdity.

The Court also concludes that Plaintiff has not made the necessary "detailed and

specific allegations" about management's exposure to information to give rise to a strong inference of scienter.  Although Plaintiff has alleged that the individual defendants attended sales-related meetings and had access to sales reports, this does not support the inference that the individual defendants must have known about the accounting misconduct.  Indeed, it is not clear to this Court exactly what information Schramm and Royal would have had about what revenue was actually counted and whether the meetings and reports should have alerted them to the fact that this information was not accurate.

However, the Court does take into consideration in its holistic analysis that the scheme involved core operations of Maxwell's business and that the individual defendants were allegedly involved or apprised on a regular basis of relevant facts, such as sales and revenue collection.  It considers that the organizational structure allegedly required the individual defendants to be involved in certain sales and credit decisions.  It also takes into consideration the magnitude of the overstatement, which comprised millions of dollars, and the long duration of the scheme.  These facts make it more likely that the individual defendants were or could have been aware of the wrongdoing.

### vi.  Approval and Holds

Plaintiff's Complaint alleges that the individual defendants were involved in or informed of various aspects of sales.  It alleges that violations were "well-known" to individual defendants because they inflated revenue by secretly modifying the payment terms, but failing to inform accounting so that it was recognized as revenue.  (Compl ¶ 58).  Plaintiff alleges that they were able to engage in fraud and cover their tracks by lifting the credit holds on the distributors who did not pay them.  (*Id.* ¶ 60).

These allegations are insufficient to independently establish a strong inference of scienter.  Even if the individual defendants knew about the extension of special terms to certain customers, and authorized lifting credit holds, this does not indicate that they knew there was an accounting problem.  Other than conclusory statements,

Plaintiff does not plead any particular facts that indicates that the individual defendants knew that the special terms and side deals were unreported. Plaintiff may be suggesting that individual defendants knew about the side deals, should have known that revenue should therefore not be recognized, and would have seen the inconsistency in financial statements. However, Plaintiff has not pleaded facts from which this Court could make those logical leaps. Close monitoring of accounts and sales does not necessarily indicate that the individual defendants would have known that the final reported accounting numbers were manipulated. Plaintiff has not pled sufficient information about the practices of the company to permit this Court to determine whether the individual defendants could have learned information about particular sales and believed the financial statements to be accurate.

However, the Court does consider the fact that the individual defendants had access to some sales information, knew about at least some payment problems, and that company policy called for them to approve lifting credit holds.

### vii. Investigations

Defendant argues that as a restatement alone does not give rise to a strong inference of scienter, neither can the "routine consequences" of a restatement. (Mot at 11). Defendants claims that such routine consequences include the signing of certifications, resignations and terminations of officers and employees engaged in intentional misconduct, the company concluding that internal controls are weak, or a government investigation. (*Id.*)

With respect to the post-restatement investigation, Defendants contend that government investigations are routine after a financial restatement. (*Id.* at 12-13). Plaintiff argues that this fact nonetheless contributes to a strong inference of scienter, especially in the wake of the recognition of other internal control problems. (Opp'n at 21). Without other information regarding the investigation, this Court cannot find that the investigation gives rise to a strong inference of scienter. Even if the investigation reflects the fact that there was misconduct and that there is suspicion that

laws were broken, this does not indicate that Schramm or Royal are suspected of misconduct, much less allow this Court to infer scienter.  It is established that there were problems in the financial statements.  Plaintiff has not demonstrated how the post-disclosure investigation supports the conclusion that these particular individuals had the required mental state.

Plaintiff also alleges that Maxwell recognized internal control problems *before* the Class Period.  The DOJ and SEC investigated Maxwell and filed actions against Maxwell for violations of the Foreign Corrupt Practices Act (FCPA) that involved the payment of $2.5 million in illicit kickbacks to foreign officials to secure and retain contracts.  (Compl. ¶ 33).  Plaintiff points to SEC charges that Maxwell did not disclose the material revenues and profits from the bribery scheme, that former Maxwell officers knew about and tacitly approved payments, that payments were not accurately recorded, and that Maxwell failed to implement or maintain a system of effective internal accounting controls.  (*Id.* ¶ 34).  Maxwell entered into  a deferred prosecution agreement which admitted responsibility (*Id.* ¶ 35).  Plaintiff's Complaint also cites two recent law enforcement investigations.  (*Id.* ¶¶ 36, 37).  In the briefing, Plaintiff cites to case law that points out that, after the occurrence of a crisis that could repeat itself, there is incentive to review results and assess the possibility of future problems.  (Opp'n at 21 (citing *Reese*, 2014 WL 555911, at *8)).

Defendants contend that pre-Class Period settlement of "unrelated" FCPA violations in China is irrelevant.  (Mot. at 13).  They point out that Maxwell disclosed the FCPA violations to the government and claim that Maxwell cooperated with the investigations.  They also point out that there were no allegations of wrongdoing against Schramm or Royal.

This Court finds that the prior investigation does not give rise to a strong inference of scienter, and does little to increase the plausibility of Plaintiff's allegations.  Schramm and Royal do not appear to be directly implicated in the FCPA misconduct.  Although the earlier violations do generally suggest problems in at least

some aspects of Maxwell's internal controls, there is no evidence before this Court to suggest that these past failings in China dealings made it more likely to have internal control problems with revenue recognition, or that it should have put the individual defendants on alert with regard to internal controls for revenue recognition.

### C.  Defendants' Arguments in Opposition to Scienter

In seeking to dismiss this action, Defendants point to allegations and publicly-available evidence that they contend undermines a finding of a strong inference of scienter.

### i.  Stock Holdings and Lack of Sales

Defendants argue that allegations of scienter are undermined by the fact that the individual defendants owned a large number of Maxwell shares, and did not sell them. They point out that when the stock price fell as a result of the disclosure, both individual defendants sustained losses.  Schramm's stock was worth $6,273,992 at the Class Period high, and fell to $1,749,023 after the March 19, 2013 disclosure. Schramm also purchased additional Maxwell stock on the open market between June 3, 2011 and August 15, 2012.  Royal's stock was worth $1,601,300 at the high point, and fell to $446,400 after the March 19 disclosure.  Defendants argue that it is "inconceivable" that they would hold their shares if they knew there was a problem. (Mot. at 8).  They further point out that these losses are larger than the 2011 bonuses of $400,000 for Schramm and $135,800 for Royal.  (*Id.* at 7-8).

Defendants point to case law in which courts found that a strong inference of scienter is contradicted where individual defendants do not sell their stock or retain a large percentage of stock.  (*Id.* at 8; *e.g. In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1177-78 (C.D. Cal. 2007) (finding that a lack of tangible personal benefit, including lack of insider sales, weighs against scienter)).  This Court has examined the cited cases.  To the extent they support Defendants' contention, they rely on the common-sense notion that a party will generally not engage in illicit behavior that will cause financial losses to himself or herself.

13cv580

Plaintiff argues that lack of stock sales does not preclude finding a strong inference of scienter. (Opp'n at 22-23). The Ninth Circuit has held that a lack of stock sales by a defendant is not dispositive as to scienter. *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) (finding scienter despite lack of stock sales). Plaintiff also argues that there are many reasons why the lack of sales does not necessarily negate scienter. Plaintiff offers a number of plausible reasons why the defendants might not sell stock despite being aware of the misconduct, including a belief that fraud would continue unabated and recognition that sales could be highly incriminating if the fraud were uncovered. (Opp'n at 23).

The fact that there were no stock sales during this period can be interpreted to support an inference that Schramm and Royal were unaware of this misconduct. However, it is also consistent with the inference that the individual defendants mistakenly believed that the fraud would remain hidden and they ultimately would be able to reap the benefits of the inflated stock value. The individual defendants may well have believed that they could engage in fraud and retain their stock without suffering financial losses.

### ii. Individual Defendants' Bonuses

Plaintiff points to Maxwell's situation before the Class Period. It alleges that it faced increased competition and lost market share. (Compl. ¶ 38). Maxwell reported "significant net losses" between 2007 and 2009. (*Id.* ¶ 39). Plaintiff contends that this incentivized individual defendants to turn Maxwell's performance around by padding financial results because their compensation was affected by these results. (*Id.* ¶ 39). Plaintiff also questions the compensation program, pointing out that despite losses and financial shortcomings, the individual defendants were able to meet the "ever-changing criteria." (*Id.* ¶ 40).

Defendants contend that the bonuses are insufficient to support scienter. They suggest that the program is an unremarkable plan designed to reward performance for

certain goals.  They also point to the fact that the 2011 bonus was lower than the 2010 bonus, and that there was no 2012 bonus.  (Mot. at 10).

The existence of performance-based compensation provides motive for the individual defendants to order or ignore misconduct that would increase revenues.  The Court considers this in its holistic review.  However, the fact that the individual defendants would benefit personally from apparent improvement in Maxwell's financial performance does not create a strong inference that the individual defendants had knowledge or were deliberately reckless regarding the misconduct.  Plaintiff's allegations that compensation criteria was manipulated to ensure bonus payment, at most, calls into question the integrity of the compensation committee, but does not make it more likely that the individual defendants knew about accounting misconduct.  Indeed, if the existence of performance-based compensation and motive to increase short-term profits were enough to establish scienter, scienter could be found for almost any executive.  *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002) (citation omitted) ("If scienter could be pleaded merely by alleging that officers and directors possess motive and opportunity to enhance a company's business prospects, 'virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'" ).

### iii. Sales Agreement

Plaintiff argues that Maxwell benefitted from the misconduct by entering into an agreement relating to the sale of stock, which ultimately produced $10.3 million in net proceeds.  (Compl. ¶ 48).  These sales took place at allegedly inflated prices several weeks before Maxwell reported disappointing financial results on April 26, 2012.  (*Id.* ¶ 49).  The Ninth Circuit has held that stock sales must be "significant enough and uncharacteristic enough to cast doubt on the defendant company's motives" in order to create a strong inference of scienter.  *Zucco*, 552 F.3d at 1006.  Although it netted significant proceeds, Plaintiff has not presented evidence to show that such an offering was uncharacteristic or out of the ordinary.  This sale does not create a strong inference

1   of scienter.

2                    iv. The Audit Committee's Investigation and Results

3           Defendants point to the fact that neither Schramm nor Royal was found by the

4   audit committee's investigation to be aware of the improper arrangements, and that the

5   sales arrangements were never communicated to the finance department. (Mot. at 12).

6   Defendants argue that terminations and resignations of other employees after the

7   investigation, including Andrews, do not prove anything about Schramm or Royal, and

8   show that proper remedial actions were taken. (*Id.*).

9           Plaintiff argues that the strong inference of scienter far outweighs any competing

10  inference provided by self-serving, self-exonerating findings of the audit committee.

11  (Opp'n at 22).  Plaintiff points out that it has not had a chance to examine the audit

12  committee's investigation and cites to caselaw that recognizes potential problems with

13  relying upon an audit committee's investigation of its own company. (*Id.*; *In re LDK*

14  *Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1246 (N.D. Cal. 2008) ("[O]fficers and

15  directors are not exonerated when their own audit committee finds nothing wrong in

16  the company's accounting practices. To rule otherwise would create a huge

17  fox-guards-the-chicken-house loophole in our private securities law enforcement.")).

18  Defendants reply that the case law cited by Plaintiff indicates that the audit committees

19  finding is not dispositive, not that it is irrelevant, and points out that Plaintiff has not

20  alleged facts questioning the sufficiency of the investigation. (Reply at 7 n.4).

21          The Court takes into account the audit committee's finding, but does not find it

22  decisive. That the audit committee conducted an investigation and did not find that the

23  individual defendants had knowledge supports the individual defendants' claim that

24  they lacked scienter. However, this Court will not dismiss the action based on the

25  findings of a committee which have not been presented or examined. The Court does

26  agree that the firings and resignations of non-defendants after the investigation do not

27  necessarily indicate that the individual defendants knew what those employees were

28  doing or participated in the misconduct.

### D. Holistic Consideration

As discussed above, none of the individual allegations is sufficient to raise a strong inference of scienter. However, the Supreme Court's decision in *Tellabs* permits "a series of less precise allegations to be read together to meet the PSLRA requirement." *S. Ferry*, 542 F.3d at 784. The Ninth Circuit has cautioned that "[e]ven if a set of allegations may create an inference of scienter greater than the sum of its parts, it must still be at least as compelling as an alternative innocent explanation." *Zucco*, 552 F.3d at 1006.

Here, the primary innocent explanation is that Schramm and Royal did not know about the improper financial misstatements and the failing in the internal controls, and were not deliberately reckless. After full review of the pleadings and the briefing on scienter, the Court has carefully weighed Plaintiff's allegations, the competing inferences, and innocent explanations. The Court concludes that, considered holistically, the Complaint as currently pled does not raise a strong inference of scienter.

Many of Plaintiff's allegations are consistent with the individual defendants' knowledge and participation in improper accounting. However, these facts are also consistent with a scenario in which other employees carried out improper accounting without the knowledge, direction, or deliberate recklessness of the individual defendants.

Viewed in the aggregate, Plaintiff alleges that the individual defendants did have some significant pieces of information related to the fraud. The individual defendants had regular access to some sales information, and the accounts of confidential witnesses indicate that Schramm and Royal were or should have been aware of some revenue collection problems. One confidential witness reports learning that some information about possible inconsistencies was given to Schramm. The confidential witness accounts of the structure of the company indicates that one or both of the individual defendants were supposed to be involved in some decisions involving

13cv580

special sales terms or lifting credit holds.  The individual defendants also clearly had information about the revenue numbers, and signed the certifications for the financial statements containing the reported revenue numbers.  The restatement indicates that the revenue numbers were substantially overstated for a period of nearly two years.  The individual defendants had a financial motive to improve the appearance of the Maxwell's financial performance, if they believed the fraud would not be discovered.

However, this is not sufficient to allow this Court to infer scienter.  There are no specific facts alleging that an individual defendant acknowledged that revenue was misreported or ordered anyone to misreport anything.  There are no specific allegations about the information accessed by the individual defendants or the nature of the accounting process which, taken in combination, suggest that the individual defendants must have known that there was an accounting deception or were deliberately reckless. This Court also considers the fact that both individual defendants suffered financial losses and that none of the internal or external investigators have yet placed blame on the individual defendants.  Although the allegations suggest that it is possible that the individual defendants had the requisite scienter, without additional allegations, Plaintiff's theory is not as cogent and compelling as the innocent explanation.

### CONCLUSION

As Plaintiff has failed to sufficiently allege scienter, the Motion to Dismiss is **GRANTED**.  This Court need not address the loss causation arguments briefly raised by the parties.  However, as Plaintiff's arguments suggest that it may be able to clarify its Complaint and add additional well-pleaded allegations regarding scienter, this Court

///

///

///

///

///

///

13cv580

1  grants leave to amend.  If Plaintiff wishes to file an amended consolidated complaint,

2  it must do so **no later than** 30 days after the date this Order is filed.

3      **IT IS SO ORDERED**.

4

5  DATED:  May 5, 2014

6  _____

7  Hon. Roger T. Benitez
   United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13cv580